### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

HACKENSACK RIVERKEEPER, INC. and
NEW CITY NEIGHBORHOOD ASSOCIATION, INC.,

        Plaintiffs,

v.

SENECA MEADOWS, INC.; WASTE CONNECTIONS
US, INC.; WASTE CONNECTIONS OF NEW YORK,
INC.; and WEST NYACK TRANSFER STATION,

        Defendants.

----------------------------------------------------------------

Case No. 21-7659

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiffs Hackensack Riverkeeper, Inc. ("Hackensack Riverkeeper") and New City Neighborhood Association, Inc. ("New City Neighborhood Association") (collectively, "Plaintiffs") by and through their counsel, hereby allege:

### I.

### INTRODUCTION

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act" or "CWA") to address and abate the above-named Defendants' ongoing and continuous violations of the Act. 33 U.S.C. § 1365.

2.     Defendants discharge polluted stormwater runoff from a scrap metal processing and recycling facility (the "Facility") into the waters of the United States in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges

Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit").

3.     Defendants' violations of the General Permit and the Clean Water Act include, *inter alia*: discharges of polluted stormwater and other pollution that are not authorized by the General Permit; inadequate pollution control measures; an inadequate stormwater pollution prevention plan; and the release of pollutants that cause or contribute to violations of water quality standards in receiving waters.

4.     Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into waters across New York.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.     Defendants' stormwater discharges contribute to this endemic stormwater pollution problem.  Defendants engage in industrial activities such as the storage and processing of scrap metal, vehicle maintenance, and vehicle traffic in and out of the Facility.  As precipitation comes into contact with pollutants generated by these industrial activities, it

conveys those pollutants to nearby surface waters.  Contaminated stormwater discharges such as those from Defendants' scrap metal recycling facility can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

7.      On June 16, 2021, Plaintiffs provided notice of Defendants' violations of the Act and of its intention to file suit against Defendants ("Notice Letter") to the above-named Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 2; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by Section 505(b)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Plaintiffs' Notice Letter is attached as Exhibit A, and is incorporated herein by reference.

8.      More than sixty days have passed since the notice letter was served on Defendants and the State and federal agencies.  Plaintiffs have complied with the Act's notice requirements. 33 U.S.C. § 1365(b)(1).

9.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.      This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

11.      Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) and (d) because at least one of the Defendants resides in the Southern District of New York and all of the Defendants reside within New York State.

## III.

## PARTIES

12.      Plaintiff Hackensack Riverkeeper, Inc. ("Hackensack Riverkeeper") is a non-profit corporation whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hackensack River and its watershed through enforcement, field work, and community action.

13.      Plaintiff New City Neighborhood Association, Inc. is a non-profit corporation whose mission is to educate residents of New City, New York on the various issues affecting their neighborhood, and to protect and preserve their quality of life.

14.      Plaintiffs have members and supporters in the New York and New Jersey region, many of whom use and enjoy the Hackensack River, which is polluted by industrial stormwater runoff from the Defendants' Facility.

15.      One such affected member and supporter lives in New City, New York.

16.      This individual is a supporter of Hackensack Riverkeeper and a member of New

City Neighborhood Association.

17.     This individual is passionate about advocating for cleaner water in and around

New City, and believes that the Hackensack River should be protected and remain in a pristine

state.

18.     On one occasion, this individual was too worried about the state of the

Hackensack River to fish in it, since the water had an offensive odor, was cloudy, and had no

visible life.

19.     This individual has not fished in the Hackensack River since that event.

20.     This event led this individual to become greatly concerned about the river's water

quality and ecology.

21.     If the water downstream of the Facility was cleaner, then this individual would

visit, hike, and fish that portion of the Hackensack River.

22.     This individual is also concerned about the impact of the Facility's discharges of

polluted stormwater on his drinking water, which is sourced from the Hackensack River

downstream from the Facility.

23.     Defendants' discharges of stormwater associated with industrial activity

containing pollutants therefore specifically impair this individual's use and enjoyment of the

Hackensack River.

24.     The interests of this individual, as well as many other supporters and members of

Plaintiffs Hackensack Riverkeeper and New City Neighborhood Association, Inc., have been, are

being, and will continue to be adversely affected by Defendants' failure to comply with the

CWA.

25.     This individual, and Plaintiffs' other members harmed by Defendants' pollution,

will be identified, pursuant to appropriate privacy and/or confidentiality safeguards, if and when an affidavit or testimony from these affected members is necessary.

26.     The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy, or adequate remedy at law.

27.     Plaintiffs bring this action on behalf of their members, respectively.  Plaintiffs' interests in reducing Defendants' discharges of pollutants into the aforementioned local waters and requiring Defendants to comply with the requirements of the General Permit are germane to Plaintiffs' purposes.

28.     Plaintiffs are informed and believe, and thereupon allege, that Defendants Seneca Meadows, Inc., Waste Connections US, Inc., Waste Connections Of New York, Inc., and West Nyack Transfer Station are corporations incorporated under the laws of the State of New York which own and/or operate the Facility.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

29.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

30.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various

enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  An NPDES permit requires dischargers of pollution to comply with various limitations.

31.    NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

32.    In New York, the DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by the DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

### Stormwater Permits

33.    In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

34.    Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

35.    In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the

levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

36.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

## New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

37.     As a delegated state NPDES permitting agency, the DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The prior version of the General Permit ("2012 Permit") was in effect between October 1, 2012, and September 30, 2017.  *New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-12-001 ("2012 Permit").  The current version of the General Permit, which renewed the 2012 Permit, went into effect on March 1, 2018, and will expire on February 28, 2023.  Permit No. GP-0-17-004 ("2018 Permit").  The 2018 Permit maintains or makes more stringent the same requirements as the 2012 Permit.  As appropriate, the 2012 Permit and the 2018 Permit are referred to collectively as the "General Permit."

38.     Under the General Permit, permittees must comply with federal technology-based standards.  The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress

towards the national goal of eliminating the discharge of all pollutants . . ." 33 U.S.C.

§ 1311(b)(2)(A).  The Act also sets a different standard, "application of the best conventional

pollution control technology" for a defined set of five "conventional pollutants."  *Id.*

§ 1311(b)(2)(E).[1]  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall

include conditions that meet the Act's technology-based standards).

39.     Accordingly, the Act requires permittees to use best management practices

("BMPs") that reflect, and prohibit the discharge of pollutants above, the level commensurate

with application of the best available technology economically achievable ("BAT"), for toxic

and non-conventional pollutants and best conventional pollutant control technology ("BCT") for

conventional pollutants.  33 U.S.C. at §§ 1314(b)(2), (4).

40.     The General Permit also ensures compliance with state water quality standards.

The Clean Water Act requires that any NPDES permit issued by a state contain any further limits

necessary to ensure compliance with a state's water quality standards.  *See* 33 U.S.C.

§§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those

necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any

applicable requirements" of 33 U.S.C. § 1311).  *See also* 40 C.F.R. § 122.44(d) (requiring that

each NPDES permit shall include any conditions necessary to achieve a state's water quality

standards).

41.     Accordingly, as a state-issued, delegated NPDES permit, the General Permit

prohibits permittees from causing or contributing to violations of water quality standards.  *See*

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

General Permit Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705."); II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

42.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must either obtain coverage under the General Permit and comply with its terms or obtain coverage under and comply with an individual SPDES permit.  33 U.S.C. § 1311(a).

### The General Permit Framework

43.     The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision.  *See* 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title[.]").

44.      At the outset, the General Permit establishes eligibility conditions that permittees must meet in order to obtain coverage.  General Permit, Part I.  Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent.  2018 Permit, Part I.D.

45.     Next, the General Permit also contains a variety of substantive limits that all permittees must meet.  These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and narrative effluent limitations that impose compulsory pollution control and minimization practices.  *See* 2018

Permit, Part II.

46.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  *See* 2018 Permit, Part VII.

47.     The General Permit sets forth additional non-numeric technology based effluent limits in the form of required BMPs for all facilities.  2018 Permit, Parts II.A.1-A.12; 2012 Permit, Part I.B.2.  In addition, the General Permit sets forth additional non-numeric effluent limit requiring particular BMPs based on the type of industrial activities occurring at a particular facility (the "sector").  2018 Permit, Part VII; 2012 Permit, Part VIII.

48.     The General Permit implements the federal technology-based (BAT/BCT) standards through a combination of general and sector-specific effluent limitations that require the Facility to "minimize" the discharge of pollutants.  *See* 2018 Permit, Part II; Part VII; 2012 Permit, Part I.B; Part VIII.  The General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice."  2018 Permit, Part II; 2012 Permit, Part I.B.2.  BMPs include changes to industrial practices and activities (for example, annual employee training programs) and structural changes to the property (for example, collection basins that reduce stormwater discharged from a facility).

49.     As noted above, the General Permit also implements the Clean Water Act's water quality based protections: it prohibits any discharge that may cause or contribute to a violation of New York's water quality standards as contained in 6 NYCRR Parts 700-705.  2018 Permit, Water Quality Based Effluent Limitation II.C.1.a; 2012 Permit, Part I.B.2. Water Quality Based Effluent Limitation II.C.1.c of the 2018 Permit holds that "any discharge which contains a

visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited."

50.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting best management practices ("BMPs") and other stormwater control measures.  *See* General Permit Part II.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  General Permit, Part II, Part III.A.7.

51.     A permittee must record the BMPs and control measures used to meet the General Permit's effluent limits in a "stormwater pollution prevention plan" ("SWPPP"). General Permit, Part III.  The owner or operator must develop, implement, and continually update the plan.  General Permit, Part III.

52.     Further, permittees must track, improve upon, and report upon their performance under the General Permit.  The General Permit requires regular inspections, monitoring and sampling of stormwater discharges, periodic reporting, and corrective action to reduce pollution when necessary.  *See* General Permit Parts IV–VI.

53.     The General Permit also relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" ("benchmarks") for each pollutant, in order to ensure that permittees are complying with the limits set forth in the

General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

54.     A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans."  60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish."  60 Fed. Reg. at 50824–25.

55.     Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988).

<u>**Key Conditions of the General Permit**</u>

56.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case with respect to the Facility.

<u>Effluent Limitations and Requirement for Adequate Control Measures</u>

57.     For facilities in Sector N, the General Permit establishes the following benchmarks: TSS – 100 mg/L, chemical oxygen demand ("COD") – 120 mg/L, O&G – 15 mg/L, total recoverable aluminum – 750 µg/L, total recoverable cadmium – 1.8 µg/L, total chromium –

1.8 mg/L, total recoverable copper – 12 µg/L, total recoverable iron – 1 mg/L, total recoverable lead – 69 µg/L, and total recoverable zinc – 110 µg/L.

58.     For facilities in Sector P, the General Permit establishes the following benchmarks: O&G – 15 mg/L, COD – 120 mg/L, benzene – 50 µg/L, ethylbenzene – 50 µg/L, toluene – 50 µg/L, and xylene – 50 µg/L.

59.     For water bodies with a designation of Class A, Table 1 of 6 NYCRR Section 703.5 provides the following water quality standards for pollutants that are discharged from the Facility: copper – 13.4 µg/L (A(A)); iron – 300 µg/L (Aesthetic (Water Source)); lead – 97.1 µg/L (A(A)); lead – 50 µg/L (Health (Water Source) ("H(WS)"); zinc – 117 µg/L (A(A)); cadmium – 3.8 µg/L (A(A)); cadmium – 5 µg/L (H(WS)).[2]

### SWPPP Requirements

60.     The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  2018 Permit, Part III.A; 2012 Permit, Part III.A.

61.     Among other things, the SWPPP must include: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location map and a site map identifying the location of the facility and all receiving waters to which

---

[2] The A(A) values for copper, lead, zinc, and cadmium are based on hardness and assume a hardness of 100 ppm.

stormwater discharges; a description of control measures and best management practices; schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility. 2018 Permit, Part III.A; 2012 Permit, Part III.C.

62.     The General Permit also includes sector-specific SWPPP requirements.  For facilities in Sector N (including Subsector N3), these requirements include, *inter alia*, a program to control materials received for processing; BMPs to minimize contact of particulate matter stored indoors or under cover from contacting surface runoff; BMPs to minimize contact of stormwater runoff with stockpiled materials, processed materials, and non-recyclable wastes; BMPs to minimize contact of residual liquids and particulate matter from materials stored indoors or under cover from coming in contact with surface runoff; a program to control what is received at the facility; measures necessary to minimize contact of surface runoff with residual cutting fluids; BMPs to minimize surface runoff from coming in contact with scrap processing equipment; and measures to minimize stormwater contamination at loading/unloading areas. 2018 Permit, Part VII.N; 2012 Permit, Part VIII.N.

63.     For facilities in Sector P, these sector-specific requirements include, *inter alia*, requirements to include measures that prevent or minimize contamination of the stormwater runoff from fueling areas; measures that prevent or minimize contamination of stormwater runoff from all areas used for vehicle/equipment cleaning; and measures that prevent or minimize contamination of the stormwater runoff from all areas used for vehicle/equipment maintenance. 2018 Permit, Part VII.N; 2012 Permit, Part VIII.N.

64.     For facilities discharging to impaired waterbodies for which the cause of the impairment is a pollutant of concern included in the benchmarks as set forth in Appendix G of

the 2018 Permit, a facility must contain the following SWPPP requirements: identification of the impaired waterbody, a list of pollutants of concern that could be discharged causing the impairment, an identification of each area of the facility that generates stormwater discharges associated with industrial activity that creates a reasonable potential to discharges the pollutants of concern, and specific BMPs to minimize the pollutant of concern from being discharged to the impaired waterbody.  2018 Permit, Part III.D.2.a-d.

Monitoring and Reporting

65.     The General Permit requires operators to collect and analyze samples of industrial stormwater discharges resulting from measurable storm events from every outfall at a facility.   The 2018 Permit requires such sampling and analysis to occur twice per year; the 2012 Permit requires sampling and analysis to occur annually.  2018 Permit, Parts IV and VI; 2012 Permit, Part, IV.

66.     The General Permit requires that facilities discharging stormwater to impaired waterbodies conduct additional monitoring.  Facilities in Sector N3 that are discharging to waters impaired for biological impacts are required to conduct quarterly monitoring of stormwater discharges.  2018 Permit, Parts IV.F.1.c, IV.F.2, Appx. G; 2012 Permit, Part IV.B.1.g, Appx. G.

67.     The General Permit requires that facilities that have an exceedance of a numeric effluent limit, or an exceedance of a benchmark cut-off concentration for a pollutant of concern to an impaired waterbody (i.e. a pollutant that is associated with the impairment), must report the results of the exceedance(s) and the corrective action(s) taken on a Corrective Action form along with the submission of the DMR reporting that exceedance.  2018 Permit, Parts VI.A.2.b, VI.B (Table VI.1); 2012 Permit, Part IV.B.1.g.(6).

<u>Corrective Actions</u>

68.     The General Permit requires "corrective actions" to improve BMPs when, *inter alia*, "the benchmark or numeric effluent limit [stormwater] sample results indicate exceedances of the pollutants."   2018 Permit Part V.A; 2012 Permit Parts IV.B.1.c.(6).(a)-(b), IV.B.1.e.(5).(a)-(b).  A discharger must implement additional structural and non-structural BMPs to prevent a recurrence of those exceedances within 12 weeks.  2018 Permit, Part V.A.1; 2012 Permit, Part III.E.2.b.(1).  If the exceedances still continue, the discharger must continue implementing additional BMPs.  2018 Permit, Part V.A.4; 2012 Permit, Parts IV.B.1.c.(6).(d).(iii), IV.B.1.e.(5).(e).(iii).  Corrective actions are also required if there is evidence indicating that stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to a violation of the water quality standards."  2018 Permit, Part II.C.1.b; See also 2012 Permit, Part I.B.3.  A failure to take the necessary and required corrective actions is a violation of the permit.  2018 Permit, Parts V, II.C.1.b; 2012 Permit, Parts IV.B.1.c.(6).(d).(iii), IV.B.1.e.(5).(e).(iii).

**<u>Beneficial Uses of New York Surface Waters</u>**

69.     The DEC has classified the portion of the Hackensack River where the Facility discharges as a Class A water.  6 N.Y.C.R.R. § 865.6.

70.     Under New York's Water Quality Standards, a waterbody that is designated Class A is a source of water supply for drinking, culinary or food processing purposes, primary and secondary contact recreation, and fishing.  6 N.Y.C.R.R. § 701.6(a).  Such waters are also meant to be suitable for fish, shellfish, and wildlife propagation and survival.  *Id*.

71.     The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and

settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others. *See generally* 6 N.Y.C.R.R. §§ 702, 703.  A waterbody must meet these numeric and narrative criteria in order to support its designated uses. *See id*. §§ 702.2, 702.9.

72.   The DEC has designated the Hackensack River as impaired pursuant to CWA Section 303(d) for failure to meet minimum water quality standards for biological impacts. *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, N.Y. DEP'T ENVTL. CONSERVATION, 27 (June 2020).

### CWA Citizen Enforcement Suits

73.   Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

74.   Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

75.   Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

76.   Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

77.   Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

**V.**

## STATEMENT OF FACTS

### Metal Recycling Facilities

78.     Metal recycling facilities, especially those with outdoor stockpiling, processing, and segregation of materials, have been identified as a major source of stormwater contamination.  Scrap metal in different stages of corrosion and decay may release a variety of harmful substances, including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues. 60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also id*. at 51189–97 (outlining special requirements for Sector N).

79.     In addition to the storage and processing of various sources of scrap metal, such facilities also conduct vehicle operation and maintenance and equipment operation and storage. Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises. Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

### The Facility and Industrial Stormwater Discharges

80.     The Facility is classified under Standard Industrial Classification ("SIC") Code 5093, meaning that it is primarily engaged in the assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials.  Activities in this SIC Code are subject to the General Permit's effluent limits for industrial Sector N.

81.     Within Sector N, the General Permit further divides recycling facilities into various sub-sectors, labeled N1 to N5, based on the kinds of recycling activities that occur on site and the potential of those activities to release pollution.  The Facility is a Sector N3 facility.  A

Sector N facility must comply with all of the General Permit's universal requirements, all requirements that apply to every Sector N facility, and all requirements that apply to any of the subsectors that describe the facility's recycling activities.

82.     The Facility also engages in vehicle maintenance and fueling activities that are classified under SIC codes subject to the General Permit's effluent limits for industrial Sector P.

83.     The Facility collects and discharges stormwater from its 3.7-acre industrial site through at least one discharge location.  Defendants have certified that the receiving water for stormwater discharges from the Facility is the Hackensack River.

84.     The Facility receives a variety of waste materials, primarily ferrous and non-ferrous metals, and store, process, crush, and compact these materials.  The majority of activity and storage at the Facility takes place outdoors, where pollutants are exposed to stormwater.

85.     When it rains, the majority of stormwater from the Facility comes from, or is commingled with runoff from, areas at the Facility where industrial processes occur.

86.     Stormwater flowing over areas of the Facility that are associated with Defendants' industrial activities collects a variety of pollutants, including but not limited to sizeable debris, sediment, oil and grease, metals, organic substances and chemicals that create chemical oxygen demand or alter the pH of receiving waters, and other pollutants.

87.     Stormwater discharged from the Facility flows into a municipal storm drain that discharge to the Hackensack River.   The Hackensack River is a water of the United States.

### Defendants' General Permit Coverage

88.     Defendants have applied for and obtained coverage for the Facility under the General Permit via a Notice of Intent ("NOI") to comply with the terms of the General Permit that Defendants submitted to the DEC.

89.     The Facility discharges under Permit ID No. NYR00F379.

**Defendants Discharge Excessively Polluted Stormwater**

90.     Defendants have taken samples or arranged for samples to be taken of stormwater discharges from the Facility.  The sample results were either reported to the DEC on written discharge monitoring reports or to the EPA and DEC jointly through EPA's electronic system for submission of discharge monitoring reports online.  Defendants certified each of those reports pursuant to the General Permit.

91.     In these stormwater sampling results, the Facility has consistently reported high pollutant levels that exceed applicable benchmarks and are evidence of ongoing violations of the effluent limitations set forth in the General Permit.

Benchmark Exceedances

92.     In the past five years, the Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including aluminum, cadmium, COD, copper, iron, lead, TSS, and zinc.

93.     The levels of aluminum in stormwater detected by the Facility have exceeded the cut-off concentration for aluminum of 750 µg/L established by the DEC.  For example, in the second half of 2020, the level of aluminum measured at the Facility's stormwater outfall was 2,680 µg/L, which is over 3 times the cut-off concentration.  Defendants have measured levels of aluminum in excess of 750 µg/L in stormwater discharged from the Facility during the following sampling periods: the third quarter ("Q3") of 2016, the fourth quarter ("Q4") of 2016, the annual period of 2016, the second quarter ("Q2") of 2017, Q3 2017, Q4 2017, the annual period of 2017, the first quarter ("Q1") of 2018, Q2 2018, the first half of 2019, the second half of 2019, and the first half of 2020.

94.     The levels of cadmium in stormwater detected by the Facility have exceeded the cut-off concentration for cadmium of 1.8 µg/L established by the DEC.  Defendants have measured levels of cadmium in excess of 1.8 µg/L in stormwater discharged from the Facility during Q1 2017.

95.     The levels of COD in stormwater detected by the Facility have exceeded the cut-off concentration for COD of 120 mg/L established by the DEC.  For example, in the second half of 2019, the level of COD measured at the Facility's stormwater outfall was 382 mg/L, which is over 3 times the cut-off concentration.  Defendants also have measured levels of COD in excess of 120 mg/L in stormwater discharged from the Facility during the following sampling periods: the annual period of 2017 and the first half of 2020.

96.     The levels of copper in stormwater detected by the Facility have exceeded the cut-off concentration for copper of 12 µg/L established by the DEC.  For example, in the second half of 2019, the level of copper measured at the Facility's stormwater outfall was 64.4 µg/L, which is over 5 times the cut-off concentration.  Defendants also have measured levels of copper in excess of 12 µg/L in stormwater discharged from the Facility during the following sampling periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual period of 2017, Q1 2018, Q2 2018, the first half of 2019, the first half of 2020, and the second half of 2020.

97.     The levels of iron in stormwater detected by the Facility have exceeded the cut-off concentration for iron of 1 mg/L established by the DEC.  For example, in the first half of 2019, the level of iron measured at the Facility's stormwater outfall was 5.78 mg/L, which is over 5 times the cut-off concentration.  Defendants also have measured levels of iron in excess of 1 mg/L in stormwater discharged from the Facility during the following sampling periods: Q3

2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual

period of 2017, Q1 2018, the first half of 2020, and the second half of 2020.

98. The levels of lead in stormwater detected by the Facility have exceeded the cut-

off concentration for lead of 69 µg/L established by the DEC.  For example, in the second half of

2019, the level of lead measured at the Facility's stormwater outfall was 253 µg/L, which is

more than 3 times the cut-off concentration.  Defendants also have measured levels of lead in

excess of 69 µg/L in stormwater discharged from the Facility during the following sampling

periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017,

the annual period of 2017, Q1 2018, Q2 2018, the first half of 2019, and the second half of 2020.

99. The levels of TSS in stormwater detected by the Facility have exceeded the cut-

off concentration for TSS of 100 mg/L established by the DEC.  For example, in the second half

of 2019, the level of TSS measured at the Facility's stormwater outfall was 560 mg/L, which is

over 5 times the cut-off concentration.  Defendants also have measured levels of TSS in excess

of 100 mg/L in stormwater discharged from the Facility during the following sampling periods:

Q3 2016, the annual period of 2016, Q2 2017, Q4 2017, the annual period of 2017, Q1 2018, Q2

2018, the first half of 2019, and the second half of 2020.

100. The levels of zinc in stormwater detected by the Facility have exceeded the cut-

off concentration for zinc of 110 µg/L established by the DEC.  For example, in the second half

of 2019, the level of zinc measured at the Facility's stormwater outfall was 458 µg/L, which is

over 4 times the cut-off concentration.  Defendants also have measured levels of zinc in excess

of 110 µg/L in stormwater discharged from the Facility during the following sampling periods:

Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual

period of 2017, Q1 2018, Q2 2018, the first half of 2019, the first half of 2020, and the second

half of 2020.

101.     These benchmark exceedances are evidence of ongoing violations of the non-numeric effluent limitations set forth in the General Permit at the Facility.

<u>Violations of Water Quality Standards</u>

102.     In stormwater sampling results, the Facility has also consistently reported high pollutant levels that Plaintiffs allege cause or contribute to violations of applicable New York water quality standards.

103.     During the past five years, the Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class A waters, including iron (A(WS)), copper (A(A)), lead (H(WS)), lead (A(A)), zinc (A(A)), cadmium (H(WS)), and cadmium (A(A)).

104.     The levels of iron in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 300 µg/L for iron (A(WS)).  For example, in the first half of 2019, the level of iron measured at the Facility's stormwater outfall was 5,780 µg/L, which is over 19 times the standard.  Defendants also have measured levels of iron in excess of 300 µg/L in stormwater discharged from the Facility during the following sampling periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual period of 2017, Q1 2018, the first half of 2020, and the second half of 2020.

105.     The levels of copper in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 13.4 µg/L for copper (A(A)).  For example, in the second half of 2019, he level of copper measured at the Facility's stormwater outfall was 64.4 µg/L, which is over 4 times the standard.  Defendants also have measured levels of copper in excess of 13.4 µg/L in stormwater discharged from the Facility during the following sampling

periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual period of 2017, Q1 2018, Q2 2018, the first half of 2019, the first half of 2020, and the second half of 2020.

106.     The levels of lead in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 50 µg/L for lead (H(WS)).  For example, in the second half of 2019, the level of lead measured at the Facility's stormwater outfall was 253 µg/L, which is over 5 times the standard.  Defendants also have measured levels of lead in excess of 50 µg/L in stormwater discharged from the Facility during the following sampling periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual period of 2017, Q1 2018, Q2 2018, the first half of 2019, and the second half of 2020.

107.     The levels of lead in stormwater detected by the Facility have also exceeded the water quality standard established by DEC of 97.083 µg/L for lead (A(A)).  For example, in the second half of 2019, the level of lead measured at the Facility's stormwater outfall was 253 µg/L, which is over 2 times the standard.  Defendants also have measured levels of lead in excess of 97.083 µg/L µg/L in stormwater discharged from the Facility during the following sampling periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q3 2017, Q4 2017, Q1 2018, and the first half of 2019.

108.     The levels of zinc in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 117.18 µg/L for zinc (A(A)).  For example, in the second half of 2019 the level of zinc measured at the Facility's stormwater outfall was 458 µg/L, which is over 3 times the standard.  Defendants also have measured levels of zinc in excess of 117.18 µg/L in stormwater discharged from the Facility during the following sampling periods: Q3 2016, Q4 2016, the annual period of 2016, Q1 2017, Q2 2017, Q3 2017, Q4 2017, the annual

period of 2017, Q1 2018, Q2 2018, the first half of 2019, the first half of 2020, and the second half of 2020.

109.     The levels of cadmium in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 5 µg/L for cadmium (H(WS)).  Defendants have measured levels of cadmium in excess of 5 µg/L in stormwater discharged from the Facility during Q1 2017.

110.     The levels of cadmium in stormwater detected by the Facility have also exceeded the water quality standard established by DEC of 3.84 µg/L for cadmium (A(A)).  Defendants have measured levels of cadmium in excess of 3.84 µg/L in stormwater discharged from the Facility during Q1 2017.

## Defendants' Inadequate Pollution Prevention Practices

111.     On information and belief, Plaintiffs allege that there are insufficient stormwater control measures and BMPs installed at the Facility.  Plaintiffs are informed and believe, and thereupon allege, that the management practices at the Facility are currently inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate stormwater pollution treatment technologies to treat stormwater once contaminated.

112.     On information and belief, Plaintiffs allege that track-out pollution (pollution carried on and falling off vehicles and their tires) is found on Defendants' access roadways and near the entrances/exits to the Facility. Stormwater washes these pollutants into storm drains that

discharge into the receiving waters.

113.    Based on the inadequacy of pollution prevention practices and the repeated

exceedances of benchmarks and water quality standards, Plaintiffs allege that since at least July

17, 2016, Defendants have failed to implement BAT and BCT at the Facility for its discharges of

TSS, iron, aluminum, copper, lead, zinc, cadmium, and COD.  As of the date of this Complaint,

Defendants have failed to implement BAT and BCT.

Inadequate SWPPP

114.    On information and belief, Plaintiffs allege that Defendants have not implemented

an adequate SWPPP for the Facility.  Plaintiffs are informed and believe, and thereupon allege,

that the SWPPP for the Facility does not set forth adequate site-specific BMPs, such as

housekeeping measures, or adequate structural control measures to be consistent with BAT or

BCT for the Facility, and to meet the General Permit's requirement to minimize pollutant

discharges.

115.    Further, on information and belief, Plaintiffs allege that Defendants have failed to

keep the SWPPP for the Facility current by amending them whenever there are changes in

design, construction, operation, or maintenance at the Facility that affect the potential to

discharge pollutants, or whenever the SWPPP has been found to be ineffective in eliminating or

significantly minimizing pollutants.

Inadequate Corrective Actions

116.    On information and belief, Plaintiffs allege that Defendants have failed to

implement sufficient corrective actions, as evidenced by the Facility's continued stormwater

sample results with exceedances of applicable benchmarks and with the reasonable potential to

cause or contribute to a violation of water quality standards (as alleged in Sections II.A–B of

Exhibit A), as set forth in Exhibit A, § II.D, and incorporated by reference.

**Defendants' Inadequate Monitoring and Reporting Practices**

117.    Plaintiffs allege that over the last five years, Defendants have repeatedly failed to comply with the General Permit's comprehensive monitoring and reporting requirements.

118.    On information and belief, Plaintiffs allege that Defendants have failed to submit the required corrective action forms for stormwater discharges that exceeded benchmarks for aluminum, copper, iron, lead, zinc, and TSS at the Facility during 2019 and 2020, as set forth in Exhibit A, § II.E.1, and incorporated by reference.

119.    On information and belief, Plaintiffs allege that during the first quarter of 2019, the third quarter of 2019, the first quarter of 2020, and the third quarter of 2020, qualifying storm events occurred, but the Facility did not collect and analyze any required stormwater discharges, as set forth in Exhibit A, § II.E.2, and incorporated by reference.

120.    On information and belief, Plaintiffs allege that, with the exception of the samples taken on specific dates, all of the events and circumstances described above have occurred continuously since at least July 17, 2016.

121.    Information available to Plaintiffs indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated stormwater.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

122.    Further detailed facts, including additional detail on specific dates of incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

**VI.**

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

123.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

124.    The General Permit requires Defendants to implement mandatory general and sector-specific control measures and BMPs in order to minimize the discharge of pollutants from the Facility.

125.    Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice."  2018 Permit, Part II; 2012 Permit, Part I.B.2.

126.    To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

127.    Based on the industrial activities carried out at the Facility, Defendants must implement the sector-specific control measures specified in the General Permit for Sectors N and P.

128.    Plaintiffs are informed and believe, and thereupon allege that, as of the filing date of this Complaint, Defendants have not implemented adequate control measures or BMPs required by the General Permit.

129.     Defendants have failed to implement control measures that meet the BAT/BCT standards at the Facility for their discharges of TSS, iron, aluminum, copper, lead, zinc, cadmium, and COD in violation of applicable benchmarks and water quality standards set forth in and incorporated by the General Permit.

130.     Each day since July 17, 2016 that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

131.     Defendants have been in violation of the BAT/BCT requirements every day since July 17, 2016.  Defendants continue to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Causing or Contributing to Violation of Water Quality Standards**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

132.     Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

133.     The General Permit states that "[i]t shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705." 2018 Permit, Water Quality Based Effluent Limitation II.C.1.a; 2012 Permit, Part I.B.2.

134.     Plaintiffs are informed and believe, and thereupon allege, that since at least June 9, 2016, Defendants have been discharging polluted stormwater from the Facility in excess of the applicable water quality standards for iron, copper, zinc, and cadmium in violation of Water Quality Based Effluent Limitation II.C.1.a of the General Permit.

135.    During every rain event, stormwater flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pollutants at levels above applicable water quality standards.  The stormwater from the Facility flows untreated into a municipal storm drain that flows into the Hackensack River.

136.    Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated stormwater are causing or contributing to the violation of the applicable water quality standards in 6 NYCRR Parts 700–705 in violation of Water Quality Based Effluent Limitation II.C.1.a of the General Permit.

137.    Every day since at least July 17, 2016 that Defendants have discharged and continue to discharge polluted stormwater from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Develop, Implement, and Make Available an
Adequate Stormwater Pollution Prevention Plan
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

138.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

139.    The General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

140.    The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

141.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

142.     The SWPPP must address both universally applicable elements as well as sector-specific requirements.

143.     The SWPPP must be representative of current site conditions and kept up to date. Defendants have failed to develop, implement, and keep up to date an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, the inadequate stormwater control measures and BMPs at the Facility and by the Facility's continuing discharges of excessively polluted stormwater.

144.     Defendants have failed to update the SWPPP for the Facility in response to the analytical results of the Facility's stormwater monitoring.

145.     Each day since July 17, 2016 that Defendants have failed to develop, implement and update adequate a SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

146.     Defendants have been in violation of the SWPPP requirements every day since July 17, 2016.  Defendants continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

**<u>FOURTH CAUSE OF ACTION</u>**
**Failure to Comply with**
**General Monitoring and Reporting Requirements**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

147.     Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

148.     The General Permit requires facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in stormwater runoff through the development and proper implementation of the facility's SWPPP.

149.    Defendants have failed to develop and implement adequate monitoring and reporting programs for the Facility.

150.    These ongoing failures are evidenced by, *inter alia*, the failure to submit the required corrective action forms for stormwater discharges that exceeded benchmarks for aluminum, copper, iron, lead, zinc, and TSS at the Facility during 2019 and 2020.

151.    These ongoing failures are further evidenced by, *inter alia*, the failure to collect and analyze stormwater samples from all qualifying events at the Facility.

152.    Each day since July 17, 2016 on which Defendants fail to comply with any of the General Permit's monitoring and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

**FIFTH CAUSE OF ACTION**
**Failure to Take Corrective Actions**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

153.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

154.    When stormwater discharges from a facility have high levels of pollutants that exceed applicable concentrations, limits, and standards, the General Permit requires operators to take "corrective actions" to improve BMPs to eliminate those exceedances.  A failure to take the necessary and required corrective actions is a violation of the permit.

155.    Plaintiffs are informed and believe, and thereupon allege, that Defendants have failed to implement sufficient corrective actions at the Facility in response to the Facility's continued stormwater sample results with exceedances of applicable benchmarks and with the reasonable potential to cause or contribute to a violation of water quality standards.

156.    Each day since July 17, 2016 on which Defendants failed to comply with the General Permit's requirement to take sufficient corrective actions is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

## VII.

## PRAYER FOR RELIEF

157.    Wherefore, Plaintiffs respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.  Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.  Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with the General Permit;

c.  Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendants to immediately implement stormwater pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendants to immediately implement stormwater pollution control and treatment technologies and measures that prevent pollutants in the Facility's stormwater from contributing to violations of any applicable water quality standards;

f.  Order Defendants to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendants to provide Plaintiffs with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.   Order Defendants to pay civil penalties of up to $56,460 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.   Order Defendants to pay the costs of litigation, including Plaintiffs' reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

l.   Award any such other and further relief as this Court may deem appropriate.


Dated this 14th day of September 2021          Respectfully submitted,
New York, New York

By:  /s/ Edan Rotenberg

Edan Rotenberg
SUPER LAW GROUP, LLC
110 Wall Street
New York, NY 10005

*Attorney for Plaintiffs*